**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HUE XIONG, | No. CIV S-08-2110-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are plaintiff's motion for summary judgment (Doc. 20) and defendant's cross-motion for summary judgment (Doc. 24).

**I. PROCEDURAL HISTORY**

Plaintiff applied for social security benefits on January 21, 2005. In the application, plaintiff claims that his disability began on December 20, 2001. Plaintiff claims that his disability is caused by a combination of major depressive disorder and PTSD symptoms,

1

otitis media (OM) with a history of tympanic membrane (TM) perforation, and osteoarthritis. Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on January 23, 2008, before Administrative Law Judge ("ALJ") Stanley R. Hogg.[1] In a May 1, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following findings:

    1.    The claimant has not engaged in substantial gainful activity since January 21, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq*.).

    2.    The claimant has the following severe impairment: depression (20 CFR 416.920(c)).

    3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

    4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to unskilled work.

    5.    The claimant has no past relevant work (20 CFR 416.965).

    6.    The claimant was born on June 15, 1962 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

    7.    The claimant is illiterate and is able to communicate in English (20 CFR 416.964).

    8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

    9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

    10.    The claimant has not been under a disability, as defined in the Social Security Act, since January 21, 2005, the date the application was filed (20 CFR 416.920(g)).

---

[1] Defendant notes that Plaintiff was previously denied benefits, technically raising a presumption of continuing non-disability. However, the ALJ did not evaluate this application on that basis, to Plaintiff's benefit.

After the Appeals Council declined review on July 10, 2008, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized below:

    A.    <u>Treating Records</u>

        <u>We Care Medical Center</u>

On March 15, 2003, Plaintiff was seen for prescriptions, headache, insomnia, and depression.[2]  He was seen for a swollen finger and medication on May 24, 2003.  On June 27, 2003, Plaintiff was seen for a cough and was assessed with bronchitis, depression, and osteoarthritis.  Plaintiff was back in on July 31, 2003, for back pain, headache and depression, and saw a physician's assistant.  It was noted Plaintiff was eating and sleeping well.  His back was tender in the lumbosacral area, but he had full range of motion.  He was assessed with depression, low back pain, and TM perforation/left otitis media.  Plaintiff was seen again for a follow-up and lab results on September 4, 2003.  Plaintiff was seen for ear pain on October 20, 2003, November 6, 2003, and December 12, 2003, and was assessed with left otitis media.

On May 24, 2004, Plaintiff was seen for fever and sore throat.  On October 5, 2004, he was seen for refill on his medication and back pain.  It was noted his neck, back and shoulder were tender, and he had decreased range of motion.  He was assessed with osteoarthritis.  He was seen again on November 10, 2004, for medication refill, headache and body pain.  He was assessed with upper respiratory infection.

On January 6, 2005, Plaintiff was seen for neck and low back pain.  He was assessed with "OA/neck/back."  (CAR 168).  He was seen for headaches on February 21, 2005.

His medication from We Care include, in addition to others which are illegible, Zoloft, Tylenol #3, and Bactrim DS.

---

[2]  A majority of Plaintiff's treatment notes are illegible.  The court has summarized them where possible.

The physician's assistant Plaintiff regularly saw at We Care completed an assessment of his physical and mental activities, which was apparently approved or written on behalf of the supervising doctor, R. A. Sychukok, M.D.  In that assessment, all of Plaintiff's abilities were rated as fair or poor.  He was rated fair in his abilities to sit, stand, ambulate independently, hear, speak, travel and balance, as well as his mental abilities for cognition, concentration, persistence, and adaption.  He was rated poor in his abilities to lift, carry, twist, bend, handle objects, and his vision, as well as his mental abilities for understanding, memory, judgment, orientation and social interaction.  (CAR 202).

### Northgate Point RST

Plaintiff's initial psychiatric evaluation at Northgate Point RST was on June 8, 2004.  With the assistance of an interpreter, Plaintiff reported that he takes Prozac with no side effects, and he has been depressed since coming to the United States in 1994.  The reasons for his depression include loss of hearing, and his inability to get SSI, speak English and work.  His activities of daily living include cooking for his children.  Plaintiff's thought process was logical, his mood was sad and worried, his affect was flat, his insight and judgment was limited.  Dr. Nguyen's diagnosis was "MDD, rec. 296.33" and noted Plaintiff's GAF at 50.  Plaintiff's Prozac was increased.

Plaintiff was seen again on January 31, 2005.  He reported being depressed and worried.  His sleep was variable; his concentration was poor.  He reported feeling tired, anxious and worried for his family.  Plaintiff's mental status examination and diagnosis was the same as above.  His Prozac was increased.

Plaintiff's last visit with Northgate Point RST was on August 16, 2005, having missed an earlier appointment.  He had been out of Prozac for three months.  He lost six pounds, had poor appetite, and poor sleep.  He reported being depressed and worried, his concentration was poor, he felt tired, anxious and worried.  His diagnosis was the same, and he was restarted on Prozac.

<u>Butte County Department of Behavioral Health</u>

Plaintiff's first visit with Butte County Department of Behavioral Health was on December 21, 2006.[3] He reported depression, poor sleep, nightmares, exposure to war trauma, and panic attacks. It appears he was diagnosed with PTSD and major depression. His affect and mood was noted to be depressed mood, sadness, blunted affect, his thoughts were distracted, his ability to focus attention and concentration was noted as severe, as was his memory. His judgment and insight were noted as average. It was recommended that Plaintiff see a staff psychiatrist at least quarterly.

Plaintiff had a follow up visits on February 15, 2007, April 25, 2007 (seems to be doing ok, but nightmares), June 18, 2007 (seems to feel much better, still having sleeping problems), July 3, 2007 (reported feeling better, help with INS application), July 19, 2007 (depression not much better), August 12, 2007 (meds helping), November 6, 2007, and January 26, 2008 (not feeling good due to pain, stable in mood, groggy, tired and lethargic).

B.  <u>Consultative Examinations</u>

<u>Psychiatric Consultive Examination, Michael L.M. Joyce, M.D.</u>

Plaintiff attended this consultative psychiatric examination, on May 4, 2006, with the assistance of a Hmong interpreter. Dr. Joyce reviewed Plaintiff's medical progress notes dated throughout 2005, which mentioned osteoarthritis of the neck and back, and bilateral hearing aids. Plaintiff reported headaches and lower back pain for over twelve years, but did not know the names of his medications. He reported no inpatient or outpatient psychiatric care. No history of psychotic or manic episodes, no panic attacks, and nothing to suggest PTSD. He described his mood as sad about his condition, but has never been suicidal, rarely drinks alcohol and never used street drugs. He lives at home with his wife and ten children, ages two through seventeen. Plaintiff wore bilateral hearing aids, and the examiner noted the conversation level

---

[3]     Most of the notes from these visits are hand written and illegible.

speech needed to be slightly elevated.  Plaintiff appeared slightly dysphoric, moderately constricted affect.  He was oriented as to person, place and time.  His judgment was grossly intact.

Dr. Joyce noted Plaintiff's diagnoses was "Mild adjustment disorder with depressive features, (?) treated."  His GAF was 65-75.  Dr. Joyce opined Plaintiff was able to manage his own funds; follow simple and complex instructions; maintain concentration and attention (was able to do so throughout the 28-minute interview); autonomously maintain a schedule with punctuality and tolerance; complete a workday and workweek without interruption from Axis I/II symptoms; and interact with others appropriately, request assistance when needed, and adhere to socially appropriate behavior, which does not distract others.  Dr. Joyce found he suffers from "mild adjustment disorder, but from purely psychiatric perspective does appear capable of responding appropriately to supervision, co-workers, or the usual work situation, including changes in routine setting."  (CAR 220).  His prognosis was fair.

<u>Internal Medical Examination, Ritu Mukerji-Metzger, M.D.</u>

Plaintiff was evaluated on May 5, 2006, by Dr. Mukerji-Metzger with the assistance of an interpreter.  His chief complaints were noted as back pain, hearing loss, and depression.  Dr. Mukerji-Metzger reviewed some primary care notes dated March 15, 2003, to February 21, 2005.  Plaintiff reported his back pain is in his right shoulder, low back and radiates to his legs bilaterally after standing for long periods of time, and both sitting and standing for long periods of time aggravate the pain.  The pain is best when he is lying still.  He reported taking ibuprofen for the pain, which provides some relief.  Plaintiff wore bilateral hearing aids, but had not been evaluated by an audiologist in over eight years.  He also reported depression and crying spells, but average energy levels, appetite and no weight loss or suicidal ideation.

Dr. Mukerji-Metzger noted Plaintiff appeared in no acute distress, was able to walk into the exam room without difficulty and sat comfortably during the exam.  Dr. Mukerji-Metzger conducted an examination of Plaintiff's eyes; ears/nose/throat, neck/nodes; chest/lungs;

cardiovascular; abdomen; pulses; coordination/station/gait; range of motion for spine, knees, ankles, and shoulders; motor strength/muscle bulk and tone; sensory; deep tendon reflexes; and cranial nerve. Following that examination, Dr. Mukerji-Metzger opined Plaintiff had no functional restrictions in his ability to stand, walk, or sit; no assistive device medically necessary; no restriction on the amount of weight Plaintiff can lift and carry; no postural or manipulative limitations; no visual limitations; but that there may be some communicative workplace environmental limitations due to his hearing loss. (CAR 223-24).

<u>Psychological Evaluation, Michelina Regazzi, Ph.D.</u>

Plaintiff's attorney referred him for this March 6, 2008, psychological evaluation. Plaintiff reported chronic pain in his lower back and neck, as well as hearing and visual problems. His medication included Epidrin, Baclofen, Hydrocodone, and Cymbalta. Plaintiff reported taking an antidepressant for the past four or five years. Plaintiff stated he was able to take care of his personal needs, but his children helped him with his medications. He takes the children to, and picks them up from, school. The older daughter does a lot of the cooking, and all of the children help with chores. He has a valid drivers license and a vehicle. He drives to the store and to the school, but his older children go with him to the grocery store as well as to pay bills. The examiner found Plaintiff had an adequate ability to express his thoughts logically, his affect was of normal range and his mood was unremarkable, although he stated he was depressed most of the time. Plaintiff's diagnosis was depressive disorder, not otherwise specified, and he had a GAF of 60.

As to Plaintiff's mental limitations, Dr. Regazzi opined Plaintiff was capable of carrying out basic personal care tasks and daily living tasks, but his daily living skills were mildly impaired. He needed assistance with all tasks that require written communication in the English language, but can travel independently and manage his own finances. He is able to understand, carry out, and remember simple instructions; respond appropriately to coworkers, supervisors, and the public, aside from the language barrier; and he has no impairments in his

ability to attend work on a regular basis and adhere to safety standards. He does have marked impairment, however, in his ability to deal with unexpected situations that might arise in the course of the workday, but this is due to his complete lack of work experience within a competitive work environment.

<u>Psychiatric Review Technique/Residual Functional Capacity</u>

Plaintiff had two reviews completed by DDS physicians. Both reviews found Plaintiff moderately limited in several categories (related to complex/detailed tasks and concentration), but not markedly limited in any category.

C.   Hearing Testimony

Plaintiff, who was represented by an attorney at the hearing, testified through a Hmong interpreter. Plaintiff testified that he was born in a village in Laos. His family were farmers and he was there during the war fighting with the Communists. He was about twelve years old when he fled from Laos to Thailand. He lived in refugee camps in Thailand and came to the United States in 1994. He went to school for two years as a boy in Laos, but had hearing and learning problems. He tried to go to school in the United States to learn English for six months, but he never caught on. He cannot read, write, or understand English at all. He can tell time and make change a little. He pays the bills, rent, and groceries.

He stated that he believed he "got an evil in Thailand . . . [and when I] got here [to] the United States, I took the medication, relieve some pain, too." (CAR 32). He had a shaman try to heal his headaches, but it did not get better. He does take medication from his doctor which helps some. He has a bad neck and back, and is always in pain. His low back starts to hurt after sitting or standing. He obtained a cane to help him walk on his own, which was not prescribed by a doctor. He has had the pain in his back for about two years, but it has gotten worse the last year. It does not, however, radiate, just stays in one place. He stated his doctors told him his spine is broken or went out. He is in severe pain daily, and it gets worse when he is going to sleep and lying down.

1    He wakes up at about 4:00 in the morning because of pain.  He cannot sleep
2 because of the pain, so he gets up and sits in the living room and watches TV.  He does not do
3 any chores around the house, he lets the kids do them.  He does watch and can help; he teaches
4 the children to do the chores.  He does do some cooking, like rice.  But he does not sweep, and
5 does not have a garden.  He does drive the children to school in the morning, which is located
6 about two blocks from his home.  He lets the older ones take care of the small children.  His wife
7 also has medical problems, so she does not do much either.  Plaintiff has a driver's license and he
8 drives the older kids to the store and helps in the shopping.  They do grocery shopping one or two
9 times a week.  He drove himself to the hearing.  After riding in the car for a distance, he feels
10 pain in his back.

11    Plaintiff stated he can stand for thirty minutes, then he will have pain in his leg
12 and back.  He can walk about one block.  He can sit for about ten or more minutes and then has
13 to change.  He sits most of the time at home, but has to change positions every thirty minutes.
14 He can lift one gallon of water, repeatedly for about ten minutes, but not for an hour.

15    He wears his hearing aids, which he had for seven years.  They will sometimes
16 cause him pain so he takes them off.  He wears them most of the day.  He is completely deaf in
17 the left ear, so the hearing aid does not help.  But he can hear with his right ear.

18    His medical problems make him depressed.  The depression makes him sad and
19 not able to do things.  He does not have any friends or hobbies, does not go to church, and has a
20 poor appetite.  He will sometimes go to the school to talk with his children's teachers.  He also
21 talks to his children.

22    He worries about having a stroke and dying.  He is afraid all the time.  He still has
23 nightmares and dreams about people who died or were wounded in Laos during the war.  He has
24 difficulty sleeping, and wakes up after only one or two hours.  When he wakes up he still feels
25 tired.
26 / / /

He stated he has ten children, nine of whom live at home and one goes to college. He takes two of the children to school in the morning, and also picks them up. He did not remember the names of the medication he takes for pain. His son helps him with it. He sees a mental health doctor as well as Dr. Vang, who is his medical doctor. He sees Dr. Vang and his mental health doctor almost every month. Dr. Vang is going to be running some tests for the headaches. His medication makes him weak and tired.

### III. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

///

## IV.  DISCUSSION

Plaintiff argues the ALJ erred in two ways: (1) the ALJ failed to properly evaluate and credit third party testimony; and (2) the ALJ failed to properly assess Plaintiff's RFC and by utilizing the Grids without a Vocational Expert.

### A.   THIRD PARTY TESTIMONY

Plaintiff argues the ALJ erred in failing to address the third party statements of Plaintiff's 17 year old son, which were consistent with his own testimony.

In determining whether a claimant is disabled, an ALJ generally must consider lay witness testimony concerning a claimant's ability to work. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at 919.

The ALJ, however, need not discuss all evidence presented. See Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir.1981).  Lay witness testimony which is neither significant nor probative may be properly ignored. See id. at 1395.  Similarly, third party testimony which is unsupported or controverted by medical evidence may be rejected. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).

Plaintiff argues Plaintiff's son's statements were consistent with his own testimony as well as the medical evidence in the record.  Therefore, it was error for the ALJ not to consider the corroborating statements.  Defendant counters that there was no error because the statements were vague and lacked specificity as to how the impairments limit Plaintiff's ability to

11

work. In addition, Defendant argues that if there was error, it was harmless error because the reasons the ALJ discounted Plaintiff's statements are equally applicable to his sons's statements as they were essentially identical, and they were inconsequential to the ultimate nondisability determination.

Here, as to Plaintiff's credibility, which is not directly at issue here but is relevant to Defendant's argument, the ALJ stated:

> the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below. Further, the evidence does not establish the existence of a severe physical impairment and the claimant's testimony concerning his physical limitations are not credible.
> In terms of the claimant's alleged back and neck pain, as noted above in the medical summary there have been virtually no abnormal signs or findings that would corroborate the presence of a medically determinable musculoskeletal disorder accounting for such complaints, which are thus not credited. Likewise, his assertions regarding his inability to stand, walk, or sit for extended periods or to otherwise perform the physical demands of any level of exertional work activity also cannot be credited for similar reasons. (CAR 15).

Plaintiff does not argue the ALJ erred in determining his credibility. Rather, Plaintiff argues the ALJ erred in not addressing his son's statements. As Defendant argues, those statements are essentially identical to his own statements as to his abilities, which were discounted. At least in part, the ALJ discounted Plaintiff's own statements as they were inconsistent with the objective medical evidence in the record, which includes his own consultative examiner, Dr. Regazzi. As both Plaintiff's statements as well as his son's were largely contradicted by the medical evidence, and the reports from the examiners, failure to specifically address the third party statements was not erroneous.

In addition, as Defendant argues, Plaintiff's son's statements were extremely general and did not provide any detail greater than Plaintiff's own statements or testimony. The statements in the third party function report were largely cumulative and not outcome

determinative. As such, even if the ALJ was required to include them in his decision, the undersigned finds the omission to be harmless error. See Stout v. Comm'n, 454 F,3d 1050, 1055 (9th Cir. 2006) (error is harmless where it "was inconsequential to the ultimate nondisability determination").

### B.     RESIDUAL FUNCTIONAL CAPACITY

#### 1.     Residual Functional Capacity

Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities"). In determining residual functional capacity, the ALJ must assess what the plaintiff can still do in light of both physical and mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

Here, as indicated above, the ALJ found Plaintiff capable of performing "a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to unskilled work." (CAR 14). This RFC was determined based on finding Plaintiff's only medically determinable serious impairment was depression. The ALJ did not find support for his claim that he suffered posttraumatic stress disorder, nor that any of his complaints of back pain and various other physical abnormalities supported a different finding. The ALJ supported this finding by noting the lack of any abnormal sign or finding to corroborate his claim of any musculoskeletal disorder. The ALJ also notes that Plaintiff's "hearing disorder is undefined and under good control with hearing aids," and his other complaints have not met the 12-continuous months criteria. (CAR 13).

Plaintiff argues the ALJ erred in his assessment because the ALJ found Plaintiff had been diagnosed with mild depressive disorder when in fact Plaintiff had been diagnosed with major depressive disorder. Plaintiff supports this argument by reference to his diagnosis from

Northgate Point RST. However, the other medical opinions in the record support the ALJ's finding, including both of the consultative examiners who opined Plaintiff suffered from mild adjustment disorder with depressive features and depressive disorder, not otherwise specified. Neither consultative examiner found Plaintiff suffered from major depressive disorder. To the extent Plaintiff is arguing the ALJ failed to adequately assess the severity of his depression, the undersigned finds that argument is not persuasive as that was the severe impairment the ALJ credited.[4]

Plaintiff further argues that the ALJ's statement that he "pays his own bills, drives, and otherwise functions fairly well in activities requiring sustained concentration, persistence, and pace, i.e., involving simple tasks" is not supported by the evidence. However, the undersigned finds the statement is supported by the record. In fact, the consultative examiners all found Plaintiff capable of handling his finances, and even his own treating source found his abilities to be fair as to concentration, persistence, and traveling. The undersigned finds that the ALJ's statement that Plaintiff is capable of simple tasks to be supported by the evidence.

Plaintiff also argues that the ALJ erred by not including Dr. Sychukok's opinions in the RFC. Specifically, Plaintiff argues the ALJ erred in not crediting Dr. Sychukok's assessment of his abilities, especially his non-exertional limitations.

First, as Defendant points out, it is unclear whether the assessment of Plaintiff's abilities was in fact Dr. Sychukok's medical opinion, or rather that of the physician's assistant. However, even if it was Dr. Sychukok's opinion, the opinion was conclusory and was not supported by any clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

---

[4] Plaintiff does not raise any argument as to the ALJ's treatment of the medical opinions, with the exception of Dr. Sychukok's conclusory assessment as discussed infra.

In addition, the ALJ evaluated all of the medical evidence in some detail. In his evaluation, he noted Plaintiff's mental status exams generally showed normal speech and thought process, and that the consultative examinations found "no significant work limitations owing to his psychiatric condition," and that "he remained capable of understanding, remembering, and carrying out simple instructions, responding appropriately to others, attend work on a regular basis, though his lack of work experience prevented him from dealing with unanticipated situations." (CAR 12, 13). The undersigned also notes that Dr. Sychukok opined that Plaintiff's abilities for cognition, concentration, persistence and adaptation were fair, while his understanding, memory, judgment, orientation, and social interaction were poor. Plaintiff argues the ALJ's RFC does not take those limitations into consideration. However, the ALJ found he had the nonexertional limitation to only perform unskilled work. In so determining, the ALJ noted that Plaintiff's "underlying treatment records even note the claimant's stability while the various other examining source records fail to note the presence of any history or current finding supporting" a diagnosis of PTSD. Plaintiff does not contend this assessment is erroneous. The ALJ further noted Plaintiff's "capacity for unskilled work is consistent with his history and his ability to obtain a driver license and to drive his children to school and to the grocery store, pay his own bills, go to meetings with his children's teaches, do some cooking, etc." (CAR 15). While Plaintiff argues this statement is not supported by the record, the undersigned finds sufficient support in the record as a whole for this assessment. In addition, the only support Plaintiff offers for any other finding is Dr. Sychukok's conclusory assessment and Plaintiff's low GAF scores. However, even Plaintiff's GAF scores do not support his argument. While he notes he was assessed with low GAF scores of 45 and 50, he was also assessed with higher GAF scores, such as a GAF of 60 and 65-75. In addition, the ALJ acknowledged Plaintiff suffers from depression, but found that the depression only resulted in moderate limitations, not marked limitations.

///

Finally, Plaintiff argues that the ALJ erred in failing to include his hearing loss, illiteracy, and inability to speak English in the RFC. However, the ALJ did acknowledge Plaintiff's illiteracy and inability to communicate in English. (CAR 15). In addition, he found that although Plaintiff did have hearing loss, that it was controlled with the use of hearing aids. This finding is supported by the record, in that none of the examining physicians opined that Plaintiff's hearing loss resulted in an inability to communicate. In fact, one of the examining physicians noted that Plaintiff' "hearing appeared to be fine as he did not ask for questions to be repeated." (CAR 284). Another examining physician noted that "[t]here may be some communicative workplace environmental limitations given his hearing loss." (CAR 224). The third examiner noted Plaintiff wore "bilateral hearing aids and conversation level speech needs to be slightly elevated." However, none of these examiners founds any significant limitation based on Plaintiff's hearing loss. In addition, the finding that Plaintiff was limited to unskilled work took into account all of these limitations, including any communication limitation because unskilled work requires working with objects more than with other people, it requires no previous work experience or special training, and involves simple duties that can be learned on the job.

Accordingly, the undersigned finds the RFC the ALJ assessed was supported by substantial evidence in the record as a whole. If there was any error in the ALJ's failure to mention Dr. Sychukok's assessment opinion, such error was harmless as there was sufficient evidence in the record to support the ALJ's RFC. See Stout v. Comm'r, 454 F.3d 1050 (9th Cir. 2006)

       2.    GRIDS vs. Vocational Expert

Finally, Plaintiff argues that the ALJ erred in relying on the Grids due to his non-exertional limitations.

The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual

functional capacity. The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity. See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids).

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the Grids accurately and completely describe the claimant's abilities and limitations. See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983). Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on exertional strength factors only.[5] See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)). The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities. See Bates v. Sullivan, 894 F.2d

---

[5] Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a). "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. See 20 C.F.R. §§ 404.1567(a) and 416.967(a). "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. See 20 C.F.R. §§ 404.1567(b) and 416.967(b). "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 C.F.R. §§ 404.1567(c) and 416.967(c). "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. See 20 C.F.R. §§ 404.1567(d) and 416.967(d). "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. See 20 C.F.R. §§ 404.1567(e) and 416.967(e).

Non-exertional activities include mental, sensory, postural, manipulative, and environmental matters which do not directly affect the primary strength activities. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

1059, 1063 (9th Cir. 1990); <u>Polny v. Bowen</u>, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations.  See <u>Roberts v. Shalala</u>, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically, where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony.  See <u>Burkhart v. Bowen</u>, 587 F.2d 1335, 1341 (9th Cir. 1988).

Here, the ALJ found Plaintiff had no exertional limitations and was capable of a full range of unskilled work.  He based this determination on the finding that Plaintiff was only moderately limited by his non-exertional limitations, which did not limit his ability to perform unskilled work which involves simple duties.

Plaintiff argues that ALJ's findings as to his limitations were not supported by the evidence in the record.  As such, he argues the ALJ erred in relying on the Grids in light of his non-exertional limitations, such as his pain, need for breaks, and concentration.  Therefore, the ALJ was required to utilize the services of a vocational expert to determine whether there were any jobs he was capable of performing .

As discussed above, the undersigned has found no error in the ALJ's determination as to Plaintiff's limitations.  Specifically, the ALJ found Plaintiff did not have any exertional limitations.  As to Plaintiff's non-exertional limitations, the ALJ found he is capable of simple, unskilled work which takes into account his moderate limitations resulting from his depression.  As the undersigned found no error in the ALJ's RFC determination, there can be no error in the ALJ's decision to utilize the Grids in light of that RFC.  The Grids are only inapplicable where there are sufficient non-exertional limitations.  Here, the ALJ concluded Plaintiff did not have any significant non-exertional limitation, and those he had were satisfied by finding he was only capable of performing unskilled, simple work.

The undersigned finds this determination to be supported the record as a whole.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 20) is denied;
2. Defendant's cross-motion for summary judgment (Doc. 24) is granted; and
3. The Clerk of the Court is directed to enter judgment and close this file.

DATED:  May 4, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE